IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sherry McCoy, | ) | C/A No.: 1:10-3139-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–33. The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.     Relevant Background

A.     Procedural History

In her 2007 application, Plaintiff alleged her disability began on July 26, 2002, because of fibromyalgia, osteoporosis, osteoarthritis, fatigue, depression, diffuse pain, memory loss from seizures, possible lupus, sleeplessness, imbalance, and loss of strength.

Tr. at 126–33, 152.  Her application was denied initially and upon reconsideration.  Tr. at 84–87, 94–95.  Plaintiff filed a request for a hearing, and Administrative Law Judge ("ALJ") Glen H. Watkins held a hearing on September 25, 2009.  Tr. at 29–52.  The ALJ issued an unfavorable decision on November 13, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–24.  Plaintiff's counsel submitted additional evidence to the Appeals Council.  The Appeals Council stated it considered the additional evidence, "but found that this information d[id] not provide a basis for changing the Administrate Law Judge's decision."  Tr. at 1–3.  Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.  42 U.S.C. § 405(g).  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on December 10, 2010.  [Entry #1].

On September 9, 2011, the undersigned issued a Report recommending this matter be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action based on the Appeals Council's failure to articulate a reason for denying review of the ALJ's decision in light of the newly submitted evidence.  [Entry #20].  Prior to the district court judge issuing a final ruling, the Fourth Circuit held that the Appeals Council is not required to articulate its rationale for denying a request for review in *Meyers v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011). The Fourth Circuit found that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence.  *Id*. Further, the court held that when the evidence is one-sided, the court may be able to

determine whether substantial evidence supports the ALJ's decision.  *Id.*  In *Meyer*, however, the court held it could not determine whether substantial evidence supported the ALJ's decision and thus remanded the case to the Commissioner.  *Id.*  On January 24, 2012, the district judge recommitted this matter to the undersigned for further analysis in light of *Meyer*.  [Entry #31].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was born on April 12, 1947, and was 62 years old at the time of the hearing.  Tr. at 23.  She has a twelfth-grade education.  Tr. at 35.  Her past relevant work ("PRW") was as a bank teller for over 36 years.  Tr. at 153.  She alleges she has been unable to work since July 26, 2002.  Tr. at 12.  Plaintiff's insured status expired on December 31, 2007.  Tr. at 14.  Thus, the relevant time period in this case is from the alleged onset of disability in July 2002 through Plaintiff's date last insured of December 2007.

2.    Medical History

The earliest medical records Plaintiff submitted to the ALJ were laboratory reports from 2002 and 2003 reflecting elevated cholesterol levels.  Tr. at 240–42.

In January 2005, Plaintiff presented to Juanchichos T. Ventura, M.D., with an "abnormal movement disorder" of her left arm and leg, consisting of "flailing, sudden movements" several times per day.   Tr. at 392.  She also complained of mild ataxia (imbalance) before and after these episodes.  *Id.*  Plaintiff had a normal activity and

3

energy level, with no fatigue, no muscle or joint pain, and no weakness or swelling. Tr. at 393. No abnormal physical or mental findings were present on examination. Tr. at 393–94. Dr. Ventura also noted that Plaintiff had recently started taking an antidepressant for symptoms of depression and anxiety. Tr. at 392. He diagnosed improved hypertension, Huntington's chorea versus a drug-induced abnormal movement disorder, tension headaches, and ataxia, and ordered further tests. Tr. at 394. An MRI of Plaintiff's head showed a nonspecific white matter signal change. Tr. at 420.

In February 2005, Plaintiff presented to Vivian Clark, M.D., for a routine examination and said that her dystonic (abnormal movement) episodes had decreased. Tr. at 388. She also stated that she had a normal activity and energy level. Tr. at 389. Plaintiff reported that an EEG of her brain showed an "abnormality" of the left hemisphere. Tr. at 388. Dr. Clark listed Plaintiff's diagnoses as hypothyroidism, stable hyperlipidemia, well-controlled hypertension, well-controlled gastroesophageal reflux disease (GERD), osteoporosis, and fibromyalgia per another physician. Tr. at 390.

In July 2005, Plaintiff returned to Dr. Ventura, who noted that Plaintiff had undergone a recent work-up for possible seizures causing the movement disorder. Tr. at 219. Plaintiff stated that, with her current medication regimen, she "ha[d]n't had anymore of the movement disorder," but did complaint of moderate to severe headaches. *Id.* She denied having seizures or any "easy fatigability," muscle pain, weakness, or arthralgias (joint pain). Tr. at 220. Physical examination did not reveal any abnormal

findings. *Id.* Dr. Ventura noted that Plaintiff was currently the primary caretaker for her mother, who had "extensive chronic medical illness." *Id.*

In October 2005, Plaintiff returned to Dr. Ventura for a follow-up visit. Tr. at 380. Dr. Ventura noted that plaintiff had not had any recurrences of her movement disorder and that numerous tests regarding the disorder had been negative. *Id.* Plaintiff was referred to Kevin Tracy, M.D., for treatment of possible lupus. *Id.* Dr. Ventura observed that Plaintiff "seemed to be doing okay" overall. *Id.* Plaintiff denied having any muscle or joint pain, weakness, or swelling, or any psychiatric symptoms. Tr. at 382. Examination did not reveal any objective abnormalities. *Id.*

Six months later, in March 2006, Plaintiff returned to Dr. Ventura and reported "tremendous improvement with her back pain and leg pains with the Lyrica that Dr. Tracy ha[d] prescribed." Tr. at 374. Although Plaintiff complained of having to cut down on the dose of Lyrica because it was causing her to be lethargic, she reported relief with the lower dose. *Id.* Dr. Ventura noted that Plaintiff had not had any further seizures and was no longer on seizure medication. *Id.* Plaintiff stated that she had a "[n]ormal activity and energy level," with no fatigue, imbalance, concentration or memory problems, or depression or anxiety. Tr. at 376.

In November 2006, Plaintiff presented to Dr. Ventura's colleague, internist Helen M. Stockinger, M.D, for a routine check-up. Tr. at 253–58. Dr. Stockinger noted that Plaintiff "reports no problems and is doing well." Tr. at 253. Past medical history is noted to include osteoporosis, fibromyalgia (per Dr. Tracy), depression, and "resolved"

seizures.  *Id.*  Regarding her arthritis pain, Plaintiff stated that Lyrica "has worked very well," and that she "could live with" her daily residual pain.  *Id.*  With respect to her fibromyalgia pain, Plaintiff reported "a lot of pain" since her diagnosis and described "pain all across her shoulders, arms, low back and legs."  *Id.*  Plaintiff also reported "some" fatigue (*id.*), and acknowledged that her depression was "doing well with [E]ffexor."  Tr. at 256.  Dr. Stockinger noted that Plaintiff "wonders if she is disabled as she would not be able to return to work if she wanted to."  Tr. at 253.  On examination, Plaintiff had tender trigger points along her legs, neck, and shoulders, but maintained normal stability, strength, and tone.  Tr. at 257.  Mentally, she exhibited appropriate judgment, normal memory, and an appropriate mood and affect.  *Id.*  Dr. Stockinger deferred to Dr. Tracy "concerning any disability."  *Id.*

In December 2006, Plaintiff returned to Dr. Tracy and complained of "fibromyalgia and fatigue problems," right knee pain with swelling, and left foot pain.  Tr. at 282.  She had full joint range of motion and no swelling, tenderness, or warmth.  *Id.*  Dr. Tracy refilled her Lyrica prescription and provided a steroid injection (Kenalog).  *Id.*

Plaintiff next saw Dr. Tracy in June 2007, and stated that the Kenalog was "periodically" helpful.  Tr. at 281.  She reported her pain level as 7/10.  *Id.*  Examination did not reveal any new muscle weakness or significant joint swelling.  *Id.*  Dr. Tracy counseled Plaintiff "about how the disability process occurs."  *Id.*

When Plaintiff returned to Dr. Stockinger on July 12, 2007, she "report[ed] no problems and [was] doing well."  Tr. at 267.  She also stated that she had "[n]ormal

activity and energy level[s]," with no fatigue, seizures, imbalance, concentration or memory problems, anxiety or depression, or changes in sleep patterns. Tr. at 268. Examination did not reveal any physical or mental abnormalities. Tr. at 269.

On July 26, 2007, Plaintiff returned to Dr. Tracy and complained of increased pain (8/10), an inability to stand "for any length of time" or lift more than 10 pounds, decreased concentration and short-term memory, and depression symptoms. Tr. at 280. Plaintiff stated that after about 15 minutes of standing, her "feet turn red and tingle and her knees swell." *Id.* X-rays revealed some joint space narrowing in both knees; lumbar facet changes at L4-5 and L5-S1; and disk changes at C3-4, C4-5, and C5-6. *Id.* Dr. Tracy prescribed Ultram and advised Plaintiff to continue with Lyrica. *Id.*

On October 25, 2007, Plaintiff returned to Dr. Tracy and reported no change in her pain level. Tr. at 287. Her neck, lumbar spine, and knees were unchanged and Dr. Tracy renewed Plaintiff's Ultram prescription. *Id.* Dr. Tracy noted that Plaintiff "gave me a copy of some form she did for Social Security." *Id.*

In a questionnaire completed in connection with her October 2007 DIB application, Plaintiff stated that she was "in constant pain throughout [her] body," had "burning & tingling in all of [her] extremities," had "extreme trouble sleeping at night," and had memory loss as a result of seizures. Tr. at 152. Plaintiff indicated that she could "feel" her seizures coming on, they "affect[ed] the right side of [her] body," and were treated with medications. *Id.* She stated in a separate questionnaire that she spent time watching television and doing "very little because of fatigue and pain." Tr. at 167. She

noted some difficulties caring for her personal needs and stated she had replaced the toilet with a taller model because her knee pain made it difficult to get up and down. Tr. at 168. Plaintiff reported that she prepared simple meals, sorted laundry, did "a little" cleaning, drove a car, shopped for groceries and clothes, attended church weekly, visited with relatives by phone, and managed her finances. Tr. at 165–71. She stated she experienced pain when lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing. Tr. at 172, 174. She indicated she could only pay attention for a short period of time, but said she could follow written and spoken instructions "okay if [they were] short and simple." Tr. at 172.

On October 31, 2007, state agency physician Dale Van Slooten, M.D., reviewed Plaintiff's records and concluded that she could lift 50 pounds occasionally and 25 pounds frequently, and stand, walk, and sit for about six hours each (with normal breaks) in an eight-hour workday. Tr. at 289. Dr. Van Slooten did not find evidence to support any additional functional limitations. Tr. at 290–92. He noted that Plaintiff was not having seizures and was not on seizure medications, that her osteoporosis was mild, that musculoskeletal and neurological examinations had been normal, that there was no evidence to support a diagnosis of fibromyalgia syndrome, and that Plaintiff's pain was controlled with medications. Tr. at 289.

On November 16, 2007, Plaintiff returned to Dr. Stockinger complaining of depression. Tr. at 301. She indicated that she was first diagnosed with depression by Dr. Ventura in 2005 and had a "fairly adequate response" to the Effexor prescribed by him.

*Id.* Plaintiff noted trouble with fibromyalgia and chronic pain, which had affected her depression. *Id.* She presented "some forms to fill out concerning her thought processes," and described her thought processes as "slowed" and "sometimes easily distractible." *Id.* She claimed to have a poor memory. *Id.* On examination, Dr. Stockinger observed a "depressed affect," but noted "no need for a psych referral." Tr. at 303. Dr. Stockinger then completed a mental questionnaire at the request of DDS in which she stated that Effexor helped Plaintiff's depression and anxiety, that psychiatric care was not recommended, and that Plaintiff had "slowed" and "distractible" thought processes; "poor" attention, concentration, and memory; and unspecified "moderate" work-related limitations in function due to her mental condition. Tr. at 297.

In December 2007, Plaintiff presented to James N. Ruffing, Psy.D., for a consultative mental status examination in connection with her DIB application. Tr. at 308. Plaintiff stated that she was anxious, depressed, and in constant pain, with loss of strength in her forearms and hands, and balance problems. *Id.* She claimed that she had memory problems ever since her seizures began in 2005, and that her most recent seizure occurred in January 2007. *Id.* She told Dr. Ruffing that she did "very little" because of fatigue and pain, but acknowledged that she cared for her personal needs, drove a car if necessary, attended church services weekly, shopped if necessary, paid bills, managed the household finances, visited with family and a friend, and did limited cooking, cleaning, and laundry. Tr. at 309. Dr. Ruffing observed that Plaintiff was able to complete the intake questionnaire and remained calm and slightly anxious during the examination. *Id.*

Plaintiff was alert, involved, responsive, pleasant, and cooperative, and had articulate speech. *Id.* She had "a very slight flattening" of affect, and stated that she felt only "a little bit depressed." Tr. at 310. She complained of low energy and decreased motivation, but denied any inpatient or outpatient mental health care other than the use of medication. *Id.* On examination, Dr. Ruffing did not observe any abnormalities in Plaintiff's orientation, thought processes, or thought content, other than to note "some somatic preoccupation." *Id.* She was able to focus and attend "without noticible distraction," and demonstrated only "very slight" slowing of cognitive processing speed. *Id.* She was able to recall words after a delay, do simple calculations, and respond appropriately to other questions tapping her memory functioning and abstract reasoning ability. *Id.* Dr. Ruffing diagnosed an adjustment disorder with mixed anxiety and a depressed mood, and stated that Plaintiff was "able to focus and attend fairly well, though possibly during heightened anxiousness and depression she may have difficulty attending fully." Tr. at 310–11. He further concluded that she was able to perform "repetitive to complex" tasks and carry out "simple to detailed" instructions. Tr. at 311.

On December 31, 2007, state agency psychologist Larry Clanton, Ph.D., reviewed Plaintiff's records and concluded that her affective and anxiety disorders caused "mild" limitations in activities of daily living and social functioning; "moderate" difficulties in concentration, persistence, or pace; and no episodes of decompensation. Tr. at 312, 322. He stated, "[w]hile her symptoms are severe, they would not preclude her from carrying out basic work functions." Tr. at 324. With regard to Plaintiff's mental functioning, Dr.

Clanton concluded that she could understand and remember simple instructions, carry out simple tasks for two hours at a time without special supervision, relate appropriately to others, and adapt to changes and recognize hazards. Tr. at 328. Three months later, a second state agency psychologist concurred with Dr. Clanton. Tr. at 333–46, 355–57.

In March 2008, state agency physician Frank Ferrell, M.D., retrospectively assessed Plaintiff's physical functioning prior to her December 2007 date last insured, based on a review of her records. Tr. at 347–54. Dr. Ferrell opined, like Dr. Van Slooten, that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, and that she could stand, walk, and sit for about six hours each (with normal breaks) during an eight-hour workday. Tr. at 348. Dr. Ferrell further found that Plaintiff could occasionally climb ladders, ropes, and scaffolds, and that she could frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. Tr. at 349.

In July 2008, Dr. Tracy completed a questionnaire in which he opined that Plaintiff could not perform even sedentary work on a sustained basis; that she could stand and walk for no more than 15 minutes at a time; that she would probably have to miss more than three days of work per month; and that she would have concentration and attention problems sufficient to frequently interrupt work tasks. Tr. at 359. As support for his opinion, he listed her diagnoses of fibromyalgia and osteoarthritis in her neck, lower back, and knees. Tr. at 360. Dr. Tracy based his opinions on following Plaintiff since 2005, as well as x-ray confirmation of the osteoarthritis. Tr. at 359–60.

In August 2008, Dr. Tracy completed another form in which he retrospectively opined that since July 26, 2007, Plaintiff had been unable to perform sedentary work (based on her pain complaints related to osteoarthritis), that she could stand and walk for less than 30 minutes during the workday, that she would miss more than three days of work per month, and that she would have attention and concentration problems sufficient to frequently interrupt work tasks (based on her complaints of problems with short term memory).  Tr. at 421–22.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the September 25, 2009 hearing, Plaintiff testified that she was 62 years old and completed the twelfth grade.  Tr. at 35.  Plaintiff stated she had not received any unemployment insurance, VA benefits, workers' compensation benefits, or long-term disability prior to her date last insured.  *Id.*  She testified that she last worked in July 2002 at which time she retired from her job as a bank teller.  Tr. at 36.  She alleged that she was unable to keep working because standing all day left her totally exhausted with blood red feet, swollen knees, and pain "all over really."  *Id.*  She claimed that her condition was related to lupus, but admitted that she had never actually been diagnosed with lupus.  *Id.*

Plaintiff testified that she was diagnosed with fibromyalgia in 2004, two years after she retired.  Tr. at 37.  She stated that when she first started taking Lyrica for her pain it helped "just a little bit," but alleged that she was never out of pain.  *Id.*  Plaintiff

said she last had seizures in 2007, but alleged continued back problems caused by disk problems, a curvature of her spine, and arthritis. Tr. at 38–39. She testified that her fibromyalgia medicine helped her back problems "some." Tr. at 39. She never had any back surgery because she said a surgeon once told her that her problems were not severe enough to warrant surgery. *Id.* Plaintiff stated that she takes medication to treat her depression. Tr. at 39–40.

Plaintiff testified that she could not walk longer than five minutes or stand longer than ten to fifteen minutes before sitting down. Tr. at 40. She claimed she could sit for ten to fifteen minutes before having to get up and move around. *Id.* She estimated that she could lift no more than five pounds. Tr. at 41. The ALJ confirmed that Plaintiff was unable to stand for more than ten to fifteen minutes prior to the date last insured, but did not clarify whether Plaintiff's other alleged functional difficulties existed as of December 2007. Tr. at 45.

With regard to Plaintiff's activities, the ALJ did not specify that Plaintiff should discuss her activities prior to the date last insured. Thus, it appears that Plaintiff's discussion of her daily activities was as of the date of the hearing. Plaintiff stated she spends most of her time sitting, watching TV, and walking around the house "a little bit." Tr. at 42. She claimed she can read "some," but her retention is "not there." *Id.* She alleged that she is not able to do any housework, vacuum, sweep, or mop, and that her husband does the grocery shopping and laundry. Tr. at 44.

b. Vocational Expert Testimony

Vocational Expert ("VE") Mark Leaptrot reviewed the record and testified at the hearing. Tr. at 47–51. Mr. Leaptrot categorized Plaintiff's PRW as a bank teller as light and skilled. Tr. at 48–49. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift up to 50 pounds occasionally; lift and carry up to 25 pounds frequently (medium work as defined by the regulations); occasionally climb ladders, ropes, and scaffolds; frequently perform all other postural limitations (e.g., climb ramps and stairs, balance, stoop, crouch, kneel, and crawl); and perform work limited to simple, routine, and repetitive tasks. Tr. at 49. Mr. Leaptrot testified that the hypothetical individual could not perform Plaintiff's PRW because it was skilled. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* Mr. Leaptrot identified medium, unskilled jobs such as a drill punch operator, with 1,800 jobs in South Carolina and at least 125,000 nationally; an automatic machine attendant, with 1,400 jobs in South Carolina and at least 95,000 nationally; and an embossing machine tender, with 1,200 jobs in South Carolina and at least 75,000 nationally.

The ALJ then described a second hypothetical individual of Plaintiff's vocational profile who could lift up to 20 pounds occasionally; lift and carry up to 10 pounds frequently (light work as defined by the regulations); stand, walk, or sit for approximately six hours per eight-hour workday; occasionally climb ladders, ropes, and scaffolds; frequently perform all other postural limitations (e.g., climb ramps and stairs, balance,

stoop, crouch, kneel, and crawl); and perform work limited to simple, routine, and repetitive tasks. Tr. at 50. Mr. Leaptrot testified that the hypothetical individual could not perform Plaintiff's PRW because it was skilled. *Id.* The ALJ noted that the hypothetical person would "grid out" based on the described parameters. *Id.*

The last hypothetical individual proposed by the ALJ also mirrored the description of the second hypothetical, but included no mental limitations. *Id.* Mr. Leaptrot testified that the hypothetical individual would be able to do the PRW of a bank teller. Tr. at 51.

In response to questioning by Plaintiff's counsel, Mr. Leaptrot stated that missing three days of work per month would preclude the jobs he mentioned and any other work because such absences would be considered excessive absenteeism. *Id.*

2.      The ALJ's Findings

In his November 13, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 26, 2002 through her date last insured of December 31, 2007 (20 CFR 404.1571 *et seq.*).

3.      Through the date last insured, the claimant had the following severe impairments: osteoarthritis, fibromyalgia, and adjustment disorder with depression and anxiety (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant has the residual functional capacity to lift and carry up to 25-pounds frequently and 50-pounds occasionally, sit, stand or walk for 6 hours in an 8-hour workday limited to occasional climbing of ropes/ladders and scaffolds and frequent climbing of stairs/steps, balancing, stooping, crouching or crawling.   She can perform simple, routine, repetitive tasks.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on April 12, 1947 and was 60 years old, which is defined as an individual of advanced age, on the date last insured (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from July 26, 2002, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(g)).

Tr. at 12–24.

D.    Appeals Council Review

Following the ALJ's denial of Plaintiff's DIB claim, Plaintiff obtained additional medical records from her doctors and submitted them to the Appeals Council for review of the ALJ's decision.

1.    Additional Medical Records Submitted to Appeals Council

Although the Appeals Council referenced an enclosed order that listed the additional evidence it considered, that order is not in the record, nor does either party reference it in discussing the additional evidence.  For purposes of considering Plaintiff's allegations of error, the undersigned focuses on the additional evidence the parties discuss.[1]

a.    Additional Records from Dr. Tracy

The record reflects that Plaintiff submitted a September 21, 2009 statement from Dr. Tracy regarding his treatment from November 18, 2005 to June 23, 2009.[2]  Tr. at 453.

_____

[1] Defendant indicates Plaintiff submitted the records from Tr. at 53–81 and Tr. at 425–73 to the Appeals Council.  [Entry #16 at 2].  Plaintiff cites to records she argues provide evidence new and material to the ALJ's decision, but she does not provide an inclusive list of all additional evidence she submitted.  The Commissioner indicated that some of the medical records sent to the Appeals Council either post-dated or did not address the relevant period, and he did not discuss those records.  *Id.* (referencing Tr. at 54–81, 455–63).  The undersigned finds that the records that post-date the date last insured and do not retrospectively address the relevant time period are not relevant to Plaintiff's appeal and do not provide a basis for remand.

[2] The statement signed by Dr. Tracy appears to have been drafted by Plaintiff's attorney based on a conversation he had with Dr. Tracy.  Tr. at 452.  The cover letter from Plaintiff's attorney enclosing the statement instructs Dr. Tracy to "look the statement over and correct in pen any inaccuracies."  *Id.*  Dr. Tracy signed the statement without making any revisions.  *Id.*

Dr. Tracy said Plaintiff "suffers from chronic pain all over her body[,]" and that fibromyalgia has been part of Plaintiff's pain problem since he began treating her. *Id.* Dr. Tracy indicated that, on evaluation, Plaintiff exhibited tenderness on 14 out of 18 potential tender points and that she experienced a "chronic diffuse pain in all of her muscles[,]" and insomnia, which is associated with fibromyalgia. *Id.* Additionally, Dr. Tracy stated that July 2007 x-rays confirmed that Plaintiff suffered from osteoarthritis in her neck, low back, and knees, and that she had moderate osteoarthritis of her cervical spine at C3–C4, C4–C5, and C6–C7. *Id.* Further, Dr. Tracy indicated Plaintiff had experienced moderate osteoarthritis in both knees since he began treating her, and she had moderate osteoarthritis in the lumbar spine at L4–5, 5–S1. *Id.*

Dr. Tracy opined that Plaintiff's neck would become increasingly sore if she were required to look down at a table all day, and that the more she was required to move her neck, the more pain she would experience in that area. *Id.* He indicated Plaintiff's low-back arthritis would require her to change positions once per hour and that her knee arthritis would permit her to walk or stand about 15 minutes at a time. *Id.* Further, he opined that Plaintiff's multiple areas of arthritis would contribute to insomnia. *Id.* Dr. Tracy stated:

> Overall, the combination of [Plaintiff's] pain from her fibromyalgia, her insomnia, and the pain from her osteoarthritis in her neck, lumbar spine and knees would make it very difficult for her to be able to maintain concentration in a workplace. She does take medications that might affect her ability to concentrate. Lyrica, Ultram and Elavil are medications that always have the potential for sedation. However, I think her pain and insomnia are enough by themselves to prevent her from being able to

concentrate on anything complicated. I do not think that she would be able to perform any type of work involving attention to detail or making judgments in a timely manner.

[Plaintiff] has been limited to sedentary work due to her knee arthritis, and has been unable to concentrate on any kind of work requiring attention to detail or quickly making judgments, since at least the first time that I started treating her in 2005. As of at least July 2007, she also had neck pain that would have further affected her ability to concentrate and low back pain that would have caused her to need to change positions from standing to sitting approximately once per hour. She would miss 3 days of work per month due to either diffuse pain from fibromyalgia or more acute pain in her spine when the weather changes. The longer she stands or walks, the more her back and knees will bother her. I can say that all of the limitations that I indicated on my functional capacity questionnaires that I completed in July 2008 and August 2009 were true as of at least July 2007.

*Id.*

Plaintiff submitted additional records from Dr. Tracy, including a December 8, 2005 treatment note in which he indicated that, despite Plaintiff's positive ANA process, he thought Plaintiff had fibromyalgia and fatigue, rather than classic lupus. Tr. at 470. Plaintiff reported a pain level of 6/10. Tr. at 471. Dr. Tracy prescribed Lyrica and Tylenol Arthritis. Tr. at 470.

When Plaintiff returned to Dr. Tracy in January 2006, she reported Lyrica seemed to help some with fibromyalgia and fatigue (*id.*) and rated her pain level as 4/10. Tr. at 469. Dr. Tracy noted, "I am glad to see she is doing better." Tr. at 468. Examinations in April and August 2006 did not reveal new problems, but indicated Plaintiff's pain level had increased to 6/10. Tr. at 464–67.

b.     Record from Wallace Thomson Hospital Radiology Department

Plaintiff's additional evidence included a July 3, 1998 cervical MRI that revealed "[m]oderate degenerative changes most marked at C5–C6 and C6–C7 resulting in mild C5–C6 greater than C6–C7 central canal narrowing. There is bilateral C5–C6 neuroforaminal narrowing." Tr. at 423–24.

c.     Treatment records from rheumatologist Jeffrey G. Lawson, M.D.

Plaintiff's additional evidence also included treatment records from rheumatologist Jeffrey Lawson, M.D. On June 30, 2004, Dr. Lawson diagnosed Plaintiff with fibromyalgia with a positive ANA, hypercholesterolemia, hypothyroidism, and hypertension. Tr. at 429–31. Plaintiff was taking Tylenol as needed for relief of joint pain, and denied any fatigue or seizures; joint examination revealed a full range of motion of the trapezius and rhomboid muscle groups, as well as the right left trochanteric bursa. Tr. at 429–30. Dr. Lawson started Plaintiff on Ambien, encouraged her to get proper sleep, to exercise, and to reduce stress. Tr. at 431. Dr. Lawson indicated Plaintiff's positive ANA was related to a family history of lupus and stated that "with proper rest and exercise program, hopefully she will not develop[] lupus in the future." *Id.*

Plaintiff returned to Dr. Lawson for follow up on August 2, 2004, and he indicated she was "doing a little better with her fibromyalgia." Tr. at 428. She reported sleeping better with Ambien and had begun a water exercise program. *Id.* Dr. Lawson adjusted

Plaintiff's medications, instructed her to get proper rest and continue to exercise, and told her to return for follow up in two months. *Id.*

She returned to Dr. Lawson on October 14, 2004, and indicated her fibromyalgia was "about the same." Tr. at 427. She reported continued discomfort in trapezius muscle groups. Plaintiff indicated she had problems with depression, for which Dr. Lawson prescribed Lexapro. *Id.* He also prescribed physical therapy. *Id.*

On January 13, 2005, Plaintiff saw Dr. Lawson and reported doing better with her fibromyalgia. Tr. at 426. She complained of mild cramping in her left foot, which Dr. Lawson indicated could be mild degenerative arthritis. *Id.* Dr. Lawson continued Plaintiff on her medications and indicated she would begin a water walking exercise program. *Id.* Plaintiff had not started on the Lexapro that had been prescribed at the previous visit. *Id.*

> d.  January 2005 to May 2006 records from Dr. Kyra B. Blatt of Carolina Neurology

In January 2005, Plaintiff saw Dr. Blatt with complaints of involuntary movements of her right arm and leg "which ha[d] been going on for the last month." Tr. at 450–51. She found Plaintiff had decreased coordination, stiffness, and involuntary movements consistent with dystonia and ordered further tests. Tr. at 450–51. In February 2005, Dr. Blatt prescribed Keppra following an EEG showing possible epileptic activity in the left part of Plaintiff's brain. Tr. at 449. Through the remainder of 2005, Plaintiff denied having any more abnormal movements, but had difficulty tolerating some of the

prescribed anticonvulsant and pain medications. Tr. at 444–48. In October 2005, Dr. Blatt found Plaintiff had a positive ANA and indicated she should see a hematologist. Tr. at 443. In January 2006, Plaintiff told Dr. Blatt the Lyrica that Dr. Tracy prescribed gave "remarkable results" and that she was "doing much better and overall feels that she has had energy to do things that she enjoys doing." Tr. at 440. As of May 2006, Plaintiff saw Dr. Blatt and indicated her mood was "very good" and that her fibromyalgia appeared to be "under control." Tr at. 436. Plaintiff indicated she had not experienced seizures since the prior February, and Lyrica continued to help alleviate her whole body pain. *Id.* Dr. Blatt noted Plaintiff was "doing wonderfully." *Id.*

### 2. Appeals Council Decision

On October 13, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision denying benefits. Tr. at 1–2. The Appeals Council indicated it "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council[.]" Tr. at 1. However, the Appeals Council "found that this information does not provide a basis for changing the Administrative Law Judge's decision." Tr. at 2.

## II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ improperly discounted the opinion of Plaintiff's treating physician;

2) the ALJ posed an incomplete hypothetical question to the VE; and

3)     the ALJ wrongly discredited Plaintiff's credibility and subjective symptoms.[3]

The Commissioner counters that substantial evidence supports the ALJ's findings and that neither the ALJ nor the Appeals Council committed legal error in finding Plaintiff was not disabled during the period at issue. Following the Fourth Circuit's *Meyer* decision, Plaintiff filed a supplemental brief [Entry #28] arguing that the medical evidence submitted to the Appeals Council was new and material and asking the court to remand the case for further fact finding. The Commissioner contends the Appeals Council evidence was cumulative and unpersuasive and requests the court affirm the Commissioner's final decision. [Entry #29].

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

---

[3] Plaintiff originally alleged the Commissioner erred in that the Appeals Council did not properly consider additional evidence presented to it and remand for further review, nor did it set forth reasons it found no need for such additional review. [Entry #15 at 31–35]. In light of the Fourth Circuit's holding in *Meyer*, Plaintiff amended this argument as set forth in her supplemental brief. [Entry #28].

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings

of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.   Analysis

1.   The Opinion of Plaintiff's Treating Physician

Plaintiff argues the ALJ erred because he did not give controlling weight to her treating physician's opinion that she "could not engage in even sedentary work on an 8-hour day, 5 days per week, sustained basis, because she could stand and walk, in combination, for a maximum of 15 minutes at one time; she would probably have to miss more than 3 days of work per month; and she would probably have problems with attention and concentration sufficient to frequently interrupt tasks during the working portion of the work day."  [Entry #15 at 17].  Plaintiff claims the ALJ should have deferred to Dr. Tracy's opinion because it was "well-supported by medically acceptable techniques" and "'not inconsistent' with other evidence."  *Id.*  The Commissioner counters that Dr. Tracy's opinions were "clear outliers" unsupported by objective findings and that the ALJ had good reason to grant little weight to Dr. Tracy.  [Entry #16 at 21–22].

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]"  SSR 96-2p; *see also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)

(finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

In considering Dr. Tracy's opinions from July 2008 and August 2009, the ALJ stated:

Dr. Tracey's statement that the claimant is disabled is an opinion about an issue reserved to the Commissioner and it not entitled to controlling weight or special significance. However, his opinion may not be ignored. I do not find the medical opinion of Dr. Tracey to be persuasive in determining the claimant's physical limitations. Dr. Tracey completed a "check-box" physical assessment in which he responded "yes/no" to a questionnaire defining "less than sedentary work" proffered by claimant's attorney. Dr. Tracey's responses that she can not perform even sedentary work on a sustained basis because she can walk only for 15 minutes total in a day, would miss more than 3 days of work a month, and is expected to experience frequent interruptions in concentration and attention because of chronic pain is not supported by the longitudinal evidence of record.

Tr. at 22. The ALJ went on to state that the record is void of objective medical findings prior to December 31, 2007 that support the functional limitations described by Dr. Tracy, and references specific medical records contradicting the alleged limitations. *Id.* The ALJ noted that Plaintiff has never been prescribed narcotic pain medication, which is typically used to treat chronic pain. *Id.*

The ALJ further stated that the medical evidence submitted by Dr. Tracy was insufficient to assess Plaintiff's functional limitations. *Id.* The ALJ noted that the actual diagnostic studies relied on for the diagnoses of fibromyalgia and osteoporosis were not included in the record. *Id.* Additionally, the record did not include a physical exam identifying specific trigger points or objective physical limitations such as decreased range of motion or muscle weakness. *Id.* The ALJ ultimately concluded that Dr. Tracy's opinion was not supported by objective physical findings and not entitled to controlling weight. *Id.*

Plaintiff argues that "perhaps the strongest possible reason to remand" is that the ALJ stated his foremost reason for discounting Dr. Tracy's opinion was that there was no objective evidence to support Plaintiff's physical limitations. [Entry #15 at 19]. Plaintiff then sets forth what she argues is the objective evidence of her osteoarthritis, *id.* at 19–21; however, Plaintiff appears to be confusing evidence of her condition with evidence of her functional limitations. At Step Three of the sequential analysis, the ALJ found that Plaintiff had osteoarthritis and classified it as a severe impairment. What he did not find, and what Plaintiff has failed to demonstrate through the medical records, is objective evidence of Plaintiff's functional limitations.

Plaintiff similarly argues that the ALJ erred with respect to her fibromyalgia. She states, "[i]t is unreasonable to find that a claimant suffers from severe fibromyalgia, then deny disability based on a lack of objective findings to support the diagnosis." *Id.* at 21–22. Plaintiff has again confused the diagnosis with the functional limitations alleged by Dr. Tracy. The evidence supporting Plaintiff's diagnosis of fibromyalgia and the manner in which the diagnosis was made is irrelevant because the ALJ found Plaintiff had fibromyalgia and classified it as severe. As with Plaintiff's osteoporosis, however, the ALJ did not find support in the record for the alleged functional limitations resulting from Plaintiff's fibromyalgia.

With respect to Plaintiff's functional limitations, the ALJ referenced specific records contradicting the limitations alleged by Dr. Tracy. Tr. at 22. Plaintiff argues the

cited records are insufficient to contradict Dr. Tracy's opinions. [Entry #15 at 22–24].

Two of the cited records are from Dr. Stockinger, Plaintiff's primary care physician, and

one of the cited records is Dr. Tracy's own treatment record from June 2007, which noted

Plaintiff's Kenalog injection was helpful and revealed no new muscle weakness or

significant joint swelling.   Tr. at 282.   The ALJ selected three records to cite as

contradictory, but the record contains many more that also could have been referenced,

including a July 2007 record from Dr. Stockinger in which Plaintiff reported "no

problems" and was "doing well" and had "[n]ormal activity and energy level[s]."  Tr. at

267–68.   Consequently, the undersigned cannot agree that the contradictory records

referenced by the ALJ are not persuasive.   The ALJ reasonably found that the treatment

records contradict Dr. Tracy's opinion regarding Plaintiff's functional limitations and his

discounting of Dr. Tracy's opinion is supported by substantial evidence.

Plaintiff also challenges the ALJ's statement that her chronic pain had never been

treated with narcotic pain medication.   [Entry #15 at 25].   Plaintiff contends the ALJ is

wrongly "second guessing" her treating physicians and the ALJ's medical judgment is

"clearly wrong."   *Id.*   Through his comment regarding Plaintiff's lack of narcotic pain

medication, the ALJ appears to have been suggesting that Plaintiff's symptoms were not

treated to the fullest extent possible.   "If a symptom can be reasonably controlled by

medication or treatment, it is not disabling."  *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th

Cir. 1986).  Consequently, the types of medications and treatments used to treat Plaintiff's

symptoms are relevant to the disability determination. *See, e.g., Coffey-Watson v. Astrue*, No. 3:09-1479, 2010 WL 3878918, at *10 (D.S.C. June 25, 2010) (considering plaintiff's minimal use of narcotic pain relievers in affirming Commissioner's denial of benefits). The ALJ's statement regarding narcotic pain medication is but one factor in his finding that Plaintiff's symptoms "are responsive to conservative treatment." Tr. at 21. Ample evidence supports this finding. *See* Tr. at 253 (Lyrica "has worked very well" and Plaintiff "could live with" residual pain); Tr. at 374 ("tremendous improvement with her back pain and leg pains with the Lyrica"); Tr. at 436 (fibromyalgia "appears to be under control," "doing wonderfully"). Thus, even if the ALJ wrongly relied on the absence of narcotic pain medications in his finding, such reliance was harmless error.

Plaintiff also argues that it was unreasonable for the ALJ to take issue with the "check-box" format of Dr. Tracy's opinions regarding Plaintiff's functional limitations because he relied on similar "check-box" forms completed by the Commissioner's own evaluating physicians. [Entry #15 at 18.] The ALJ discounted Dr. Tracy's opinions in part because the opinions were expressed through a "check-box" physical assessment proffered by claimant's attorney in which he responded "yes/no" to a questionnaire defining "less than sedentary work." Tr. at 22. Plaintiff admits that checkbox answers may be given less weight unless such answers are supported by a written explanation of the opinion or supported by underlying treatment records. [Entry #15 at 18 (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993); *Larson v. Astrue*, 615 F.3d 744, 751 (7th

Cir. 2010))].  Plaintiff argues, however, that Dr. Tracy explained the bases for his opinions and referenced x-ray confirmation of knee, neck, and back arthritis and should be given normal weight.  [Entry #15 at 18].  Having reviewed the record evidence, the parties' arguments, and the ALJ's decision, the undersigned disagrees with Plaintiff.

The questionnaires completed by Dr. Tracy on which Plaintiff relies to support her alleged functional limitations required him to simply answer "yes" or "no" and to provide very limited written explanation for a few of his responses.  Tr. at 359–60, 421–22. "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Mason* at 1066.  The undersigned therefore finds that the ALJ was justified in according Dr. Tracy's opinion less weight.

Plaintiff argues the ALJ should have recontacted Dr. Tracy if he found the evidence insufficient to support Dr. Tracy's assessment of Plaintiff's functional limitations.  [Entry #15 at 26].  Pursuant to 20 C.F.R.§ 404.1512(e), the ALJ will recontact medical sources "[w]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled."  Plaintiff's counsel represented at the hearing that the record in this case was complete.  Tr. at 32.  The ALJ reviewed the evidence presented and did not conclude that the evidence was insufficient to render a disability determination.  Consequently, it was unnecessary for him to recontact medical sources.[5]

---

[5] The undersigned concludes *infra* that the additional evidence submitted to the Appeals Council would not have changed the ultimate determination by the

In this case, the ALJ found that Dr. Tracy's opinion regarding Plaintiff's functional limitations contradicted his own treatment notes and other medical evidence in the record. Even though Plaintiff cites to portions of the record that support Dr. Tracy's opinions and gives explanations for why certain findings are missing from the reports of other treating physicians, the court notes that this information was before the ALJ in making his decision. It is not for the court to reweigh the evidence presented to the ALJ. Rather it is the court's limited function to determine whether the ALJ's decision applied the appropriate legal standard and is supported by substantial evidence. Here, the ALJ thoroughly reviewed the medical evidence, articulated specific reasons for discrediting Dr. Tracy's opinion, and cited persuasive contradictory evidence. Therefore, having reviewed the record, the undersigned recommends a finding that the ALJ's explanation of weight given to Dr. Tracy's opinion reached the level of specificity required by law and was supported by substantial evidence.

2.     Sufficiency of the ALJ's hypothetical question to the VE

Plaintiff argues that the ALJ erred at Step Five of the sequential evaluation process by presenting an incomplete hypothetical to the VE. [Entry #15 at 27]. At Step Five, the ALJ must determine whether, considering a claimant's age, education, work experience, and residual functional capacity ("RFC"), there are jobs that exist in significant numbers

---

Commissioner. Therefore, even if the ALJ should have recontacted Dr. Tracy or other of Plaintiff's medical providers, his failure to do so was harmless error because the additional records would not have changed the outcome.

in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1569, 404.1569(a). In this case, the ALJ posed a hypothetical to a VE to assist in making this determination. Plaintiff argues that the ALJ erred by finding at Step Three that Plaintiff had a moderate mental limitation in concentration, persistence or pace yet failing to include this finding in his hypothetical to the VE. [Entry #15 at 27].

As stated above, in making his determination at Step Five, the ALJ had to consider Plaintiff's RFC. The moderate mental limitations the ALJ found in his Step Three analysis were used to rate the severity of Plaintiff's mental impairment, which is a separate analysis from the ALJ's assessment of Plaintiff's RFC. *See* 20 C.F.R. § 416.929(a). As required by the sequential evaluation process, the ALJ appropriately incorporated his Step Three findings into his RFC determination limiting Plaintiff to "simple, routine, repetitive medium work." Tr. at 21; *see Wood v. Barnhart*, No. 05-432, 2006 WL 2583097, at *11 (D. Del. Sept. 7, 2006) (by restricting plaintiff to jobs with simple instructions, the ALJ adequately accounted for plaintiff's moderate limitation in maintaining concentration, persistence or pace). The ALJ stated, "[i]n determining that claimant is limited to unskilled work, I have taken into consideration her subjective allegations that she has difficulty with concentration and remembering because of pain." Tr. at 21. The ALJ noted that Plaintiff "actually demonstrated requisite memory and concentration to remember and carryout complex tasks in her mental status exam." *Id.*

The ALJ was required to use his RFC assessment, not his Step Three finding, in determining whether jobs exist in significant numbers in the national economy that Plaintiff could perform. Therefore, the ALJ did not err in failing to include his Step Three findings in posing a hypothetical to the VE.

### 3. The ALJ's Consideration of Plaintiff's Subjective Complaints

Plaintiff challenges the ALJ's finding regarding her credibility, claiming that he "based his credibility determinations on presumptions and speculation, and failed to provide sufficiently specific reasons for those determinations." [Entry #15 at 31]. The Commissioner argues the ALJ's credibility analysis is valid and substantially supported. [Entry #16 at 22].

SSR 96–7p requires that, prior to considering Plaintiff's subjective complaints, the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. If so, the ALJ is to consider the record as a whole, including both objective and subjective evidence, in assessing Plaintiff's credibility regarding the severity of his subjective complaints, including pain. *See* SSR 96–7p; *see also* 20 C.F.R. § 404.1529(b); *Craig v. Chater*, 76 F.3d 585, 591–96 (4th Cir. 1996). The ALJ need not accept Plaintiff's subjective complaints at face value and may consider her credibility in light of her testimony and the record as a whole. If the ALJ rejects a claimant's testimony about his pain or physical condition, he is to explain the basis for

such rejection to ensure that the decision is sufficiently supported by substantial evidence and to permit the claimant and subsequent reviewers to understand the weight and the reasons for the weight the ALJ gave Plaintiff's subjective claims. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n. 2 (4th Cir. 1984)); SSR 96–7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC. Tr. at 21.

The undersigned recommends finding that the ALJ adequately considered Plaintiff's subjective complaints and articulated his reasons for finding Plaintiff's claims about her pain less than fully credible. The ALJ's determination is supported by substantial evidence.

The ALJ found that Plaintiff's allegations "that she has not been able to work because of joint and muscle pain, fatigue, swelling in her feet, weakness in her hands as well as symptoms of depression anxiety are not supported by the objective medical evidence." Tr. at 19. For example, in March 2006,[6] Plaintiff reported "tremendous

---

[6] The undersigned notes that the ALJ improperly dated and cited this record; however, the content of the record remains the same, making the incorrect citation

improvement" with her back pain and leg pain with the Lyrica prescribed by Dr. Tracy and stated that she experienced relief with a lower dose than prescribed. Tr. at 19, 374. Medical records from Plaintiff's family physician dated nine months *after* her date last insured noted no muscle or joint pain, weakness, stiffness, swelling or inflammation, with the only abnormality being tender trigger points in the neck, low back, and shoulders. Tr. at 19, 365–66.

In making his credibility determination, the ALJ did not rely solely on the lack of objective evidence. As he is required to do, he cited additional reasons why Plaintiff's testimony was not credible. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994). He noted that Plaintiff claimed she stopped working in 2002 because of medical problems. Tr. at 19. The record before the ALJ, however, was void of any medical treatment prior to January 2005, when she was evaluated for transient involuntary movements (which she has not experienced since late 2005). *Id.* The additional medical records submitted to the Appeals Council documented a June 2004 visit to a rheumatologist, leaving two years between when Plaintiff retired and when she sought medical treatment for her alleged symptoms. *See* discussion of Appeals Council evidence, *supra*; *see also Mickles* at 921 (suggesting that failure to seek medical treatment may support a finding that claimant's impairments are not disabling). The ALJ noted that the earliest reference to Plaintiff's

---

harmless error.

inability to work was her inquiry regarding eligibility for disability in June 2007.[7]  Tr. at 19.

With regard to Plaintiff's symptoms of depression and anxiety, the ALJ noted they are minimal and stable with psychotropic medication.  Tr. at 19; *see Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (holding that if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling).  The ALJ further noted that Plaintiff had never sought mental health counseling.  *Id.*  Although Plaintiff complained of decreased drive and motivation, fatigue, and loss of energy, she demonstrated adequate cognitive, memory, and concentration skills on her mental status exam to perform repetitive to complex tasks and to understand, remember, and carry out simple to detailed instructions.  *Id.*

In addition, the ALJ discussed Plaintiff's activities of daily living ("ADLs"), which included routine household chores, independent hygiene and grooming, driving as needed, attending church weekly, managing the household finances, and using a checkbook to pay bills.  Tr. at 20.  The ALJ noted that Plaintiff had also cared for her ill mother until December 2006.  *Id.*  The ALJ reasonably relied on Plaintiff's ADLs to conclude her impairments were not as severe as she claimed.  *See* 20 C.F.R. §

---

[7] The ALJ's citation on this point is likewise in error.  On November 6, 2006, Dr. Stockinger stated, "At this point she wonders if she is disabled as she would not be able to return to work if she wanted to."  Tr. at 253.  Plaintiff's first statement regarding disability was made approximately seven months earlier than the date noted by the ALJ. Because the ALJ was pointing out the time that had passed between Plaintiff's retirement in 2002 and her disability inquiry, the seven-month difference is also harmless error.

404.1529(c) (3)(i) (ADLs are relevant factors when evaluating symptoms); *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (the ALJ logically reasoned that claimant's ability to engage in a wide variety of activities was inconsistent with her statements of excruciating pain and her inability to perform such regular movements like bending, sitting, walking, grasping, or maintaining attention).

If the ALJ had relied solely on a lack of objective evidence to support his credibility determination, Plaintiff would have been correct that he did so in error. His decision, however, sets forth other grounds upon which he appropriately relied in discounting Plaintiff's subjective complaints. The ALJ's determination not to fully accept Plaintiff's claims of wholly disabling pain is supported by substantial evidence, and the undersigned recommends Plaintiff's third allegation of error be dismissed.

4.    Appeals Council Evidence

Plaintiff argues that the additional evidence she submitted to the Appeals Council is new and material and should be weighed by a fact finder. [Entry #28 at 6–7]. In response, the Commissioner argues the additional evidence is cumulative and unpersuasive and that the substantial evidence supported the Commissioner's final ruling. [Entry #29 at 2–3].

The additional evidence submitted to the Appeals Council (discussed in detail *supra*) includes a narrative statement from Dr. Tracy dated September 21, 2009, regarding his treatment of Plaintiff from November 18, 2005 to June 23, 2009, Tr. at 453; additional

medical records from Dr. Tracy from December, 2005 through August, 2006 documenting Plaintiff's increasing pain levels, Tr. at 464–71; a cervical MRI dated July 3, 1998, revealing degenerative disk changes, Tr. at 423–24; treatment records from rheumatologist Jeffrey G. Lawson dated June 30, 2004 to January 13, 2005, Tr. at 426–33; and treatment records from neurologist Kyra B. Blatt date January 28, 2005 to May 9, 2006, Tr. at 436–51.

Plaintiff argues that the narrative statement from Dr. Tracy specifically addresses the ALJ's concern over the "check-box" nature of Dr. Tracy's prior opinions. [Entry #28 at 7]. Plaintiff further argues that the cervical MRI satisfies the ALJ's concern regarding the record's lack of diagnostic studies. *Id.* at 7–8. The Commissioner argues that Plaintiff should have submitted the additional records to the ALJ and urges the court to reject Plaintiff's "blatant attempt to now gain a 'second bite at the apple.'" [Entry #16 at 13].

> a. The Appeals Council properly considered the additional evidence.

Under 20 C.F.R. § 404.970(b), the Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (*en banc*). In order to be "new" evidence, the evidence must not be "duplicative or cumulative," and in order to be "material," there must be a "reasonable

possibility that it would have changed the outcome." *Id.* at 96. After evaluating the record, including the new and material evidence, the Appeals Council "*will then review the case if it finds the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.*" 20 C.F.R. § 404.970(b) (emphasis in original).

In its October 13, 2000 notice denying Plaintiff's request for review, the Appeals Council stated that it considered "the additional evidence" provided by Plaintiff in rendering its decision. Tr. at 1. The Appeals Council incorporated the additional evidence into the record and wrote that where it receives "new and material evidence and the decision is contrary to the weight of all the evidence now in the record," the Appeals Council will review the case. *Id.* After reviewing all of the evidence, the Appeals Council concluded there was no reason under its rules to review the ALJ's decision. *Id.* In so finding, the Appeals Council properly considered the allegedly "new and material" evidence but found that the substantiality of the evidence supported the ALJ's decision.

Under *Meyer v. Astrue*, it was not necessary for the Appeals Council to articulate its rationale for declining to review the ALJ's decision. 662 F.3d 700, 706 (4th Cir. 2011). Consequently, to the extent Plaintiff seeks remand because he contends the Appeals Council did not properly consider the additional evidence under 20 C.F.R. § 404.970, the undersigned recommends denying Plaintiff's request.

   b. Plaintiff has not established good cause for a fact finder to consider the additional medical evidence.

Even assuming the Appeals Council did not consider all of the additional evidence submitted by Plaintiff in its decision to deny review,[8] the Plaintiff has not demonstrated that remand is justified under sentence six of 42 U.S.C. § 405(g). Under 42 U.S.C. § 405(g), the court may remand a case and order additional evidence to be taken "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."

Under *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985),[9] additional evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative;" "material to the extent that the Secretary's decision 'might reasonably have been different' had the new evidence been before her;" "[t]here must be good cause for the claimant's failure to submit the evidence when the claim was

---

[8] This assumption is advanced because the record does not clearly articulate which medical records were submitted for the first time to the Appeals Council or which records the Appeals Council reviewed and made a part of the record. The Appeals Council notice denying review referenced an "enclosed Order" listing the additional evidence, Tr. at 1, but no such order was made a part of the record.

[9] There is some question in this circuit whether the four factor test applied in *Borders* has been superseded by the revised version of Section 405(g) cited above. In *Wilkins v. Sec'y of Dep't of Health & Human Services*, 925 F.2d 769, 774 (4th Cir. 1991), *vacated en banc on other grounds*, 953 F.2d 93, the court suggested in a parenthetical that *Borders* had been superseded by statute. However, *Borders* has not been overruled, and the Supreme Court cited the case in *Sullivan v. Finkelstein*, 496 U.S. 617 (1990) and did not suggest that the *Borders* factors are not properly considered. *Wallace v. Comm'r of Soc. Sec.*, No. 8:10-1031-RBH, 2011 WL 4435793 (D.S.C. Sept. 23, 2011).

before the Secretary"; and "the claimant must present to the remanding court 'at least a general showing of the nature' of the new evidence." *Id.*

Plaintiff has not satisfied the *Borders* test because he has not shown good cause for his failure to incorporate this evidence in the record before the ALJ. The narrative statement from Dr. Tracy is dated four days prior to the hearing before the ALJ. Plaintiff provides no explanation for why she did not submit the statement at the hearing. The MRI; the records from Dr. Lawson and Dr. Blatt; and the additional relevant records from Dr. Tracy likewise existed prior to the hearing, but were not presented to the ALJ. Plaintiff's counsel represented at the hearing that the record was "complete and up to date." Tr. at 32. In the three briefs filed with this court, Plaintiff's counsel has not offered an explanation for not producing the additional evidence—all of which was available at the time of the hearing—to the ALJ. The undersigned finds no good reason for the failure to provide this evidence to the ALJ; thus, Plaintiff has failed to make a showing of good cause sufficient to warrant remand.

      c.      Even considering the Appeals Council evidence, substantial evidence supports the ALJ's decision.

Because the Appeals Council made the additional evidence a part of the record, the undersigned has considered it in determining whether the ALJ's decision was supported by substantial evidence. As noted above, the record before the ALJ included the substantial evidence necessary to support his finding. The evidence presented to the Appeals Council does not change the result.

Plaintiff argues the September 21, 2009 statement from Dr. Tracy addresses the ALJ's concerns regarding the "check-box" nature of Dr. Tracy's prior opinions. [Entry #28 at 6–7.] Based on the cover letter from Plaintiff's counsel to Dr. Tracy found in the record, the statement was drafted by Plaintiff's counsel. Tr. at 452. Signing the statement requires even less effort and explanation than Dr. Tracy's prior opinions. Consequently, the rationale used by the ALJ in discounting Dr. Tracy's prior opinions applies equally to the later-submitted statement.

Plaintiff also argues that the submission of the 1998 cervical MRI alleviates the ALJ's concerns over the "absence of objective medical findings." [Entry #28 at 6–7.] Plaintiff contends the MRI documented degenerative changes and that Dr. Tracy based his opinion regarding Plaintiff's spine problems on the MRI. *Id.* at 7. Plaintiff continues to confuse objective findings of her diagnoses with objective findings supporting her alleged functional limitations. The MRI is evidence of Plaintiff's condition, not her functional limitations. Because the ALJ found that Plaintiff had the severe impairment of osteoarthritis, which the MRI might be helpful in diagnosing, the submission of the MRI to the Appeals Council has no bearing on the ALJ's determination.

Plaintiff does not address the reasons the remaining records might be considered new and material or alter the decision of the ALJ. The undersigned, however, has considered them and concluded that they are not sufficient to overcome the substantial evidence in the record supporting the ALJ's denial of benefits.

III.    Conclusion and Recommendation

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence. This court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The Commissioner is charged with resolving conflicts in the evidence, and this court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Based on the foregoing, it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

February 10, 2012                                Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).